NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| TODD A. MOLLOY,<br><br>         Plaintiff,<br><br>                 v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social<br>Security,<br><br>         Defendant. | Civil Action No. 13-06035<br><br>**OPINION** |

Daniel Sylvester Jones
Law Offices of Harry J. Binder & Charles E. Binder
60 East 42nd Street
Suite 520
New York, NY  10165
     Attorney for Plaintiff

Daniel Robert Janes
Social Security Administration
Office of the General Counsel
26 Federal Plaza
Room 3904
New York, NY  10278
     Attorney for Defendant

**BUMB**, United States District Judge:

Plaintiff Todd A. Molloy (the "Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for social security disability benefits ("SSD"). For the reasons that follow, this Court will VACATE the

Commissioner's final decision and REMAND this matter for further proceedings consistent with this Opinion.

## I.  Standard of Review

A reviewing court must uphold the Commissioner of Social Security's factual findings if they are supported by "substantial evidence," even if the court would have decided the inquiry differently. 42 U.S.C. §§ 405(g), 1383(c)(3); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001). "Substantial evidence" means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Cons. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). Where the evidence is susceptible to "more than one rational interpretation, the Commissioner's conclusion must be upheld." Ahern v. Comm'r of Soc. Sec., 165 F. App'x 212, 215 (3d Cir. 2006) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984); Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986)).

If faced with conflicting evidence, however, the Commissioner "must adequately explain in the record his reason for rejecting or discrediting competent evidence." Ogden v.

Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v.

Heckler, 786 F.2d 581 (3d Cir. 1986)). Stated differently,

> [Unless] the [Commissioner] has analyzed all evidence
> and has sufficiently explained the weight he has given
> to obviously probative exhibits, to say that his
> decision is supported by substantial evidence
> approaches an abdication of the court's duty to
> scrutinize the record as a whole to determine whether
> the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting

Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th

Cir. 1977)) (internal quotations omitted); see also Guerrero v.

Comm'r of Soc. Sec., No. 05-1709, 2006 WL 1722356, *3 (D.N.J.

June 19, 2006) ("The [administrative law judge's] responsibility

is to analyze all the evidence and to provide adequate

explanations when disregarding portions of it."), aff'd, 249 F.

App'x 289 (3d Cir. 2007).

While the Commissioner's decision need not discuss "every

tidbit of evidence included in the record," Hur v. Barnhart, 94

F. App'x 130, 133 (3d Cir. 2004), it must consider all pertinent

medical and non-medical evidence and "explain [any]

conciliations and rejections." Burnett v. Comm'r of Soc. Sec.,

220 F.3d 112, 122 (3d Cir. 2000); see also Fargnoli, 247 F.3d at

42 ("Although we do not expect the [administrative law judge] to

make reference to every relevant treatment note in a case where

the claimant . . . has voluminous medical records, we do expect

the ALJ, as the factfinder, to consider and evaluate the medical

evidence in the record consistent with his responsibilities under the regulations and case law.").

In addition to the "substantial evidence" inquiry, the reviewing court must also determine whether the ALJ applied the correct legal standards. See Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000). The court's review of legal issues is plenary. Sykes, 228 F.3d at 262 (citing Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999)).

## "Disability" Defined

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Act further states,

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

4

The Commissioner has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. § 404.1520(a)(4)(i-v). In Plummer, 186 F.3d at 428, the Third Circuit described the Commissioner's inquiry at each step of this analysis:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).
>
> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that [his] impairments are "severe," [he] is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.
>
> Step four requires the ALJ to consider whether the claimant retains the residual functional capacity[1] to perform [his] past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to [his] past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). If the claimant is unable to resume [his] former occupation, the evaluation moves to the final step.
>
> At this [fifth] stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant

---

[1] "Residual functional capacity" is the most the claimant can still do despite the limitations caused by his impairments. 20 C.F.R. § 404.1545(a)(1).

is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [his] medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether [he] is capable of performing work and is not disabled. See 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. See Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

## II.   Procedural Background

On August 19, 2009, Plaintiff filed an application for SSD, alleging a disability onset date of February 10, 2009. (Administrative Record "R." 252-55.) The claim was denied initially and again upon reconsideration. (Id. at 89-96.) Plaintiff requested a Hearing before an Administrative Law Judge ("ALJ") on August 2, 2010. (Id. at 97.) The Honorable Jonathan L. Wesner held a hearing on April 19, 2011, at which Plaintiff appeared and was represented by counsel. (Id. at 50-65.) The ALJ issued his decision on May 9, 2011, finding that Plaintiff was not disabled and denying SSD. (Id. at 68-78.)

Plaintiff requested review of the ALJ's decision, and the Appeals Council vacated the decision and remanded for further proceedings. (Id. at 85-87.) In particular, the Appeals Council directed the ALJ to:

- Update the medical record and obtain additional evidence regarding Plaintiff's impairments;

6

- Further evaluate the claimant's depression in accordance with 20 C.F.R. 404.1520a;

- Give further consideration to Plaintiff's RFC, and in so doing evaluate the opinions of the treating and nontreating sources as well as the nonexamining sources; and

- If warranted, obtain evidence from a vocational expert.

The ALJ held a second hearing on July 16, 2012 (id. at 23-47), and issued a decision on October 3, 2012 again finding that Plaintiff was not disabled and denying benefits (id. at 6-17). Plaintiff requested review of the ALJ's decision, which was denied on May 31, 2013. (Id. at 1-5.) Thus, the ALJ's decision became the final decision of the Commissioner. See 20 C.F.R. § 404.981.

## III.  Factual Background

Plaintiff was born in 1979 and was 29 years old at the alleged date of onset. (R. 252.) He has a high school education and previously worked as a cable installer and a retail store manager. (Id. at 284, 41.) On February 10, 2009, Plaintiff underwent surgery for removal of a right maxillary cyst, and later developed an infection. (Id. at 343-44, 397, 405.) Although the infection was resolved within a month, Plaintiff developed the symptoms and impairments that formed the basis of his application for benefits. (Id. at 54.)

7

### a. Plaintiff's 2011 Hearing Testimony

At the initial hearing before the ALJ, Plaintiff testified that he was unable to work due to his frequent migraines and vertigo. (Id. at 56.) He claims to have at least one migraine a day, and for the worst ones, he would go to bed and close the blinds. (Id. at 54.) Although he takes medication for his migraines, which sometimes "take[s] the edge off," it does not offer complete relief. (Id. at 57.) His migraines are exacerbated by light and sound. (Id. at 59.)

Plaintiff experiences vertigo at "random" times. He later testified, however, that the vertigo was "almost always present to one degree." (Id. at 58.) Because of the vertigo, he tries not to drive further than the supermarket, which is approximately three miles away. (Id. at 57.)

He spends his days reading the Bible, or using the computer, and sometimes tries to assist his wife with home-schooling his daughter. (Id. at 58.) After about 15 minutes, however, he needs to take a break for approximately 30-45 minutes. (Id.)

Plaintiff further testified that he is unable to walk long distances or sit for a prolonged time without changing positions. (Id. at 60.) At least once a week, Plaintiff requires assistance with showering because of his vertigo, and he dresses while lying down in bed. (Id. at 61.)

8

Plaintiff also has been diagnosed with sleep apnea, but he uses a CPAP machine that has completely resolved any related issues. (<u>Id.</u> at 55.)

### b. Plaintiff's 2012 Hearing Testimony

At the remand hearing in 2012, Plaintiff testified that his sleep has not been as restful over the prior six months despite his use of the CPAP but that the doctor believes this is a side effect of his medication. (<u>Id.</u> at 28.) He further testified that he has migraines several times a day that last for one or more hours. (<u>Id.</u> at 30.)

He began taking Lyrica in 2010 for his fibromyalgia, and testified that it subsides his most severe migraines within approximately five minutes, but then it renders him virtually immobile because of the effects on his vertigo. (<u>Id.</u> at 29.) He uses Lyrica approximately 2-3 times per month.

Plaintiff testified that the vertigo is "near-constant" but varies in severity. (<u>Id.</u> at 30.) However, it causes him to stumble and fall at least once daily.

As to his activities, Plaintiff usually awakens around 12:00 or 1:00 p.m., and tries to assist his wife with home-schooling his daughter. (<u>Id.</u> at 33.) He spends a lot of time on the computer, but he switches activities approximately every 30-45 minutes. He continues to drive about once a week, taking his wife to the store. He also drove himself to the hearing. (<u>Id.</u> at

34.) He testified that he is unable to shop at length but is able to pick up a few things at the store. (Id. at 31-32, 34.) He stated that he is no longer able to shower because it makes him dizzy, but he is usually able to bathe himself without assistance. (Id. at 34-35.) He also prepares premade meals. (Id. at 35.)

According to Plaintiff, he can stand for less than 10 minutes and can only sit for 30 minutes at a time. (Id. at 36.) He also testified that he is able to lift and carry a few books, or pick up his daughter briefly. (Id. at 37.) He is involved in his church and tries to attend services three times a week. However, he stated that he does not interact with anyone while there and sometimes sits in the vestibule because of the noise. (Id. at 37.)

### c. Medical Evidence

On March 30, 2009, Plaintiff had an MRI that showed "mild cerebellar tonsillar ectopia without evidence of Chiari malformation," and a 12-mm pineal cyst. (Id. at 602.) No other abnormalities were noted.

Dr. Stephen Bromley began treating Plaintiff on April 23, 2009. (Id. at 362.) Plaintiff reported headache in the form of head pressure, fatigue, and dizziness. Dr. Bromley recorded maxillary tenderness, but otherwise noted no limitations in his examination. (See id. at 363.) He diagnosed, inter alia,

headache syndrome suggestive of migraine variant, as well as non-specific dizziness, and noted a pineal cyst that was "likely incidental." (Id. at 364.)

On June 23, 2009, Dr. Bromley again saw Plaintiff who reported intermittent headache and dizziness. (Id. at 359.) Plaintiff described two types of headaches: a short-acting pain and a longer unilateral pain. The dizziness was in the form of "slight room movement but is essentially nonspecific." (Id. at 359-60.) An earlier MRI showed a "benign" 12-mm pineal cyst but no strokes or bleeds, while a CT showed no osteomyelitis. (Id.) Dr. Bromley noted full motor and sensory functions, but mild neck spasm and generalized anxiety. (Id. at 360.) Dr. Bromley prescribed medication for the dizziness and migraines, and recommended a sleep study to address Plaintiff's insomnia. (Id.)

On September 17, 2009, Dr. Stephen Akers reported that Plaintiff had participated in a sleep study that demonstrated severe sleep apnea but that it was eliminated with the use of a CPAP. (Id. at 407.)

On October 30, 2009, a hospital examination showed full range of motion, with no limitation, upper extremity strength of 5/5, intact sensation, and no tenderness to palpitation. (Id. at 536-37.) An MRI of Plaintiff's lumbar spine and a CT scan of his cervical spine revealed no abnormalities. (Id. at 542-43.) The

11

doctor concluded that there appeared to be no link between his spine and the symptoms he reported experiencing. (Id. at 537.)

On January 11, 2010, Dr. Robert J. Waters, state agency psychologist, conducted a mental status examination. (Id. at 463-65.) Plaintiff informed Dr. Waters that he is unable to work because of migraines, episodic pain throughout his body, and near constant dizziness. He also reported that he uses a CPAP machine that "works well" and allows him to get "good sleep." (Id. at 463.) Plaintiff further stated that while he has been depressed it is "mild" or "minor at best." (Id.) Dr. Waters recorded that Plaintiff is able to perform chores and tasks on a limited basis, is able to shower, groom, and feed himself, shop independently when necessary, and drive on a limited basis. (Id. at 464.) He also stated that he enjoys reading the Bible, going to church, listening to music, and singing. His gait and posture were unremarkable and his concentration was intact. (Id. at 465.) Dr. Waters concluded that Plaintiff's "moderate to severe limitations are due mainly to his physical status. His mental status plays a less significant role in his occupational limitations. His vertigo presents his most significant obstacle to adapting to a typical work environment." (Id. at 465.)

On February 3, 2010, Dr. Deogracias Bustos, state agency medical consultant completed a physical RFC assessment. (Id. at 485-92.) He determined that Plaintiff could occasionally lift

and carry up to 20 pounds, frequently lift and carry up to 10 pounds, stand or walk at least 2 hours, and sit for about 6 hours in a day. He further opined that Plaintiff had no limitations in pushing or pulling, and could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl. However, Plaintiff should avoid concentrated exposure to extreme cold or heat, wetness, humidity, vibration, and fumes, and avoid all exposure to noise and hazards. Dr. Bustos concluded that the degree of Plaintiff's alleged difficulties is not totally supported by objective evidence. (Id. at 490.) Dr. Bustos' assessment was affirmed by Dr. Jyothsna Shastry on June 30, 2010. (Id. at 493.)

On March 15, 2010, a new MRI was taken and showed "mild cerebellar tonsillar ectopia measuring 5 mm which is at the borderline for a Chiari I malformation."[2] (Id. at 601.) The radiologist noted that this "can be a cause for headaches." The MRI also showed a "stable" 12 mm pineal cyst but was otherwise unremarkable. (Id.)

---

[2] "Type I Chiari malformation involves the extension of the cerebellar tonsils (the lower part of the cerebellum) into the foramen magnum, without involving the brain stem. Normally, only the spinal cord passes through this opening. Type I, which may not cause symptom, is the most common form." Young v. Colvin, No. 13-248, 2014 WL 4918325, at *3 n.1 (M.D. Pa. Sept. 30, 2014) (citing http://www.ninds.nih.gov/disorders/chiari/detail_chiari.htm (last visited September 25, 2014)).

On April 8, 2010, Dr. David Condoluci, an infectious disease specialist, wrote a letter noting that Plaintiff has had vertigo and recurrent migraines since December 2009. (Id. at 598.) An examination conducted at that time was unremarkable. Dr. Condoluci ran serologies, but they were negative. He reported a normal blood count, an elevated C-reactive protein,[3] and evidence of a previous parvovirus infection. Dr. Condoluci further noted that an MRI showed a stage I Chiari malformation. Dr. Condoluci stated, "[b]ecause of the persistent vertigo, [plaintiff] has been unable to work; therefore, the [sic] pursuing evaluation by a neurosurgical specialist and we gave him decreasing doses of Prednasone over the next several weeks." He further stated that Plaintiff was a "work-up in progress" because of his vertigo, "but it is clear that he is not able to work because of the severe vertiginous episodes that he has." (Id. at 598.)

On April 21, Plaintiff saw Dr. Alan Turtz for a neurosurgical follow-up. Plaintiff reported lightheadedness when he gets up, headache, random pains, a visual disruption, and some mental processing difficulty. (Id. at 599.) Upon examination, Plaintiff exhibited 5/5 motor strength and normal

---

[3] A C-reactive protein is a "marker of systemic inflammation." See Heim v. Life Ins. Co. of N. Am., No. 10-1567, 2012 WL 947137, at *1 n.4 (E.D. Pa. March 21, 2012).

sensory testing, as well as normal ambulation. However, he became lightheaded when going from lying to sitting and sitting to standing, and he stumbled once when walking. (Id.) Dr. Turtz expressed doubt that Plaintiff's symptoms were related to the MRI findings. (Id. at 600.)

On June 14, 2011, Dr. Bromley completed a Multiple Impairment Questionnaire that listed as diagnoses migraine variant, vestibulopathy/chronic dizziness related to migraine, fibromyalgia, and obstructive sleep apnea.[4] (Id. at 614-22.) According to Dr. Bromley, Plaintiff's prognosis was fair to poor for a return to full functional capabilities. (Id.) Dr. Bromley recorded that Plaintiff's migraines are "generally triptan-responsive." (Id.) Dr. Bromley opined that Plaintiff could sit for 2 hours, and stand or walk for only 1 hour but must get up and move around every 30 minutes to 1 hour. (Id. at 616.) He further noted minimal limitations for using fingers or hands for fine manipulations or reaching, as well as minimal limitations for grasping, turning, and twisting objects. Despite these benign findings, Dr. Bromley later opined that Plaintiff was significantly limited in doing repetitive reaching, handling, fingering or lifting because it would exacerbate his pain. (Id.

---

[4] Although Dr. Bromley reports that he has treated Plaintiff since June 23, 2009, the Record does not contain treatment notes for the period December 1, 2009 to June 14, 2011.

at 617, 620.)  Dr. Bromley recorded that Plaintiff's depressed mood and anxiety are part of his symptom complex and contribute to the severity of his limitations. (Id. at 618.) He also stated that Plaintiff would need to break 6-7 times per day for an average of 5-10 minutes, and he would likely be absent more than 3 times per month. (Id. at 617, 621.) Dr. Bromley concluded that Plaintiff's symptoms would frequently interfere with his attention and concentration. (Id. at 617.)

On June 14, 2012, Dr. Joseph Yellin examined Plaintiff and completed a headache questionnaire. The diagnoses are migraine variant and tension headaches. (Id. at 623.) He listed Plaintiff's prognosis as "guarded." Dr. Yellin recorded Plaintiff as experiencing vertigo and dizziness, and noted that Plaintiff had approximately 25 headaches a month that usually lasted for only "minutes." (Id. at 624.) Dr. Yellin opined that Plaintiff was capable of tolerating a low stress job but would be precluded from performing basic work activities during a headache. (Id. at 627.) He further estimated that Plaintiff would likely be absent more than 3 times per month due to his impairment. (Id.) Dr. Yellin attached a report to the questionnaire that provided further explanation. During Dr. Yellin's examination of Plaintiff, he appeared alert, oriented, and cooperative with normal range of motion of the spine and intact sensory examination. (Id. at 631.) In addition, fine

16

finger coordination was normal. Plaintiff complained, however, of pain and tenderness when touched. Dr. Yellin also noted that Plaintiff had difficulty walking but "the pattern of which is not clearly characteristic [of] a specific neurologic condition." (Id.) He also stated that "[a]t this time, Mr. Molloy is considered to be totally disabled in his prior occupation and is not able to work." (Id.)

### d. The ALJ's 2012 Decision

Applying the requisite five-step analysis described above, the ALJ concluded that Plaintiff meets the insured status requirements through December 31, 2014 but has not engaged in substantial gainful activity since February 10, 2009, the alleged onset date. (R. 11.) At Step Two, the ALJ found that Plaintiff suffers the following severe impairments: maxillary sinus cyst surgery with post-operative infection, migraine headaches, vertigo, sleep apnea, and obesity. (Id. at 12.) However, he determined that Plaintiff's depression was not severe. (Id.) At Step Three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or is medically equivalent to a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.)

The ALJ then considered Plaintiff's residual functional capacity ("RFC"), relying on the following medical evidence, inter alia:

17

- A report and Medical Source Statement from Dr. Bromley, Plaintiff's treating physician (Exs. 4F, 9F, 21F);

- A letter from Dr. Condoluci, Plaintiff's treating physician (Ex. 19F);

- A headache questionnaire completed by examining physician Dr. Joseph Yellin (Ex. 22F); and

- The opinion of Dr. Bustos, state agency medical reviewer, which was confirmed by Dr. Shastry (Exs. 13F, 14F).

The ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b), except that he could lift 10 pounds occasionally, stand/walk at least 2 hours in an 8-hour workday, occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and can never climb ladders or scaffolding. Additionally, he should avoid concentrated exposure to temperature extremes, wetness, humidity, fumes, odors, dust, and gases due to respiratory problems, avoid all exposure to vibration, noise, and hazards, as well as heights due to dizziness and vertigo, and avoid noise due to migraines. In addition, he is limited to unskilled work. (Id. at 12.) In crafting Plaintiff's RFC, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms to be

> not fully credible, considering the claimant's own description of his activities and life style, the degree of medical treatment required, discrepancies between the claimant's assertions and information contained in the documentary reports, the reports of the treating and examining practitioners, the claimant's demeanor during the hearing, the medical

18

history, the findings made on examination, and the
claimant's assertions concerning his ability to work.

(Id. at 14.)

At Step Four, the ALJ determined that Plaintiff is unable
to perform any past relevant work. (Id. at 15.) The ALJ also
determined that Plaintiff was 29 years old on the alleged onset
date, which is defined as a "younger" individual under 20 C.F.R.
§ 416.963(c), has a high school education, and can communicate
in English. (Id. at 16.) Finally, at Step Five, the ALJ
determined, after consulting a vocational expert, that there are
significant numbers of jobs in the national economy that
Plaintiff can perform given his age, work experience, and RFC.
(Id. at 16-17.) Accordingly, the ALJ concluded that Plaintiff
has not been under a disability since February 10, 2009 through
the date of the decision.

**IV.  Legal Analysis**

On appeal, Plaintiff argues that the ALJ failed: (1) to
appropriately weigh the opinion of Plaintiff's treating
physician, Dr. Bromley, as well as the opinions of Dr.
Condoluci, an infectious disease specialist, Dr. Yellin, an
examining neurologist, and Dr. Bustos, a nonexamining
consultant; and (2) to properly evaluate Plaintiff's credibility
in accordance with Social Security Ruling ("SSR") 96-7p. The
Court addresses each argument in turn.

19

### a. The Opinions of Plaintiff's Treating and Examining Physicians[5]

Plaintiff first argues that the ALJ did not give appropriate weight to the testimony of his treating physician, Dr. Bromley, with respect to the Doctor's assessment of his physical capabilities. Relatedly, Plaintiff argues that the ALJ erred in rejecting the well-supported opinions of his treating and examining physicians, Drs. Condoluci and Yellin. Ultimately, Plaintiff contends that the ALJ should not have favored the opinion of a state agency medical consultant, Dr. Bustos, who reviewed an allegedly deficient record over those of Plaintiff's treating and examining physicians. Because the Court finds this last argument most persuasive, it will address it first.

The Social Security Administration regulations regarding the evaluation of evidence from treating physicians advises that the opinion of a treating physician receives controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). However, the ALJ is not bound to accept the opinion of a treating physician without weighing it against the

---

[5] This Court construes Plaintiff's arguments regarding the ALJ's determinations with respect to her treating physician as a challenge to the ALJ's RFC finding at Step Four. See <u>Johnson v. Comm'r</u>, 529 F.3d 198, 201 (3d Cir. 2008).

other medical evidence of record. Kent v. Schweiker, 710 F.2d 110, 115 n.5 (3d Cir. 1983). The existence of contradictory medical evidence allows an ALJ to reject a treating physician's testimony. See Jones v. Sullivan, 954 F.2d 125, 128-29 (3d Cir. 1991). In rejecting a treating physician's testimony, the ALJ must explain his reasoning on the record. See Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989). Moreover, an ALJ may not make speculative inferences from medical reports. Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). "While the ALJ must consider all of the evidence and various influencing factors in making an RFC determination, the final responsibility for deciding this issue is reserved to the Commissioner; the ALJ is not required to 'give any special significance to the source of an opinion on issues reserved to the Commissioner . . . .'" Buckley v. Astrue, No. 09-5058, 2010 WL 3035746, at *9 (D.N.J. Aug. 3, 2010) (quoting 20 C.F.R. § 404.1527(e)(2)-(3)).

Ultimately, Plaintiff challenges the ALJ's reliance on the February 3, 2010 opinion of state agency consultant, Dr. Bustos, arguing that he reviewed an incomplete record that did not include the March 15, 2010 MRI findings or a medical source statement concerning Plaintiff's functional capacities. (See R. 491, 486.)

The Third Circuit has held that:

21

> Although treating and examining physician opinions
> often deserve more weight than the opinions of doctors
> who review records, see, e.g., 20 C.F.R.
> § 404.1527(d)(1)-(2), "[t]he law is clear . . . that
> the opinion of a treating physician does not bind the
> ALJ on the issue of functional capacity," Brown v.
> Astrue, 649 F.3d 193, 197 n.2 (3d Cir. 2011). State
> agent opinions merit significant consideration as
> well. See SSR 96-6p ("Because State agency medical and
> psychological consultants ... are experts in the
> Social Security disability programs, . . . 20 C.F.R.
> §§ 404.1527(f) and 416.927(f) require [ALJs] . . . to
> consider their findings of fact about the nature and
> severity of an individual's impairment(s) . . . .").

Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir.

2011) (affirming denial of benefits where the ALJ afforded more

weight to the non-examining source); see also Williams v.

Astrue, 317 F. App'x 212, 215-16 (3d Cir. 2009) (finding

"substantial evidence supports ALJ's decision to credit the non-

examining consultant's findings over the examining consultant's

assessment"). Thus, "[i]t is not necessarily error for the ALJ

to afford greater weight to the opinion of a state agency

medical consultant over the opinions of treating and examining

physicians or psychologists." Kroh v. Colvin, No. 13-1533, 2014

WL 4384675, at *18 (M.D. Pa. Sept. 4, 2014). Indeed, the ALJ may

assign great weight to a non-examining, non-treating physician's

opinion if the assessment is well-supported by the medical

evidence of record. See, e.g., Sassone v. Comm'r of Soc. Sec.,

165 F. App'x 954, 961 (3d Cir. 2006).

22

However, at least one court in this Circuit has held that "[a]n RFC form prepared by a non-examining state agency medical consultant cannot constitute substantial evidence where it is not based upon the full medical record before the ALJ at the time of hearing and decision, particularly where the medical evidence suggests a deterioration in the claimant's condition." See Kroh, 2014 WL 4384675, at *21 (citations omitted). In addition, the Third Circuit and some courts in this Circuit have found that an ALJ erred in relying on nontreating or nonexamining medical sources where those medical sources did not have access to the entire medical record. Cadillac v. Barnhart, 84 F. App'x 163, 169 (3d Cir. 2003) ("It was error for the ALJ to have favored medical opinions based on an incomplete record over those based on the complete record, and to have done so because she injected her own medical opinion into the mix."); Santos v. Colvin, No. 13-1612, 2014 WL 5474576, at *16 (M.D. Pa. Oct. 28, 2014) ("As discussed, in order for the ALJ to properly give any weight to a medical opinion, the entire medical record must have been available for and reviewed by the non-examining, non-treating physician.").

Here, Dr. Bustos provided a physical RFC assessment on February 3, 2010 that was nearly identical to the RFC assigned by the ALJ. (See R. 12-13.) Dr. Bustos' assessment was confirmed several months later on June 30, 2010 by Dr. Shastry. (Id. at

493.) This occurred subsequent to the March 15, 2010 MRI showing a borderline Chiari I malformation that the radiologist suggested could be a cause of Plaintiff's migraines and the April 2010 evaluations of Drs. Condoluci and Turtz. However, the confirmation occurred prior to the June 14, 2011 questionnaire completed by Plaintiff's treating physician and the June 12, 2012 headache questionnaire completed by Dr. Yellin. In confirming Dr. Bustos, Dr. Shastry commented that Plaintiff's recently-completed disability report alleged no worsening of symptoms and thus recommended affirmation of Dr. Bustos' opinion. (R. 493; see also id. at 296, 309.) In light of this comment, it is unclear from the record whether Dr. Shastry even reviewed the 2010 MRI and April 2010 evaluations (which should have been available to him at the time of his review) prior to affirming Dr. Bustos. By the time of the 2012 hearing, however, Plaintiff had alleged a worsening of his symptoms. See supra.

Because the medical record that Dr. Bustos (and Dr. Shastry) reviewed was incomplete and did not contain at the very least a medical source statement from a treating physician, the ALJ should have sought a new or updated medical expert opinion, especially in light of the Appeals Council's instruction that the ALJ should update the medical evidence of record.[6] (R. 86.)

---

[6] The Appeals Council also suggested that, if appropriate, the ALJ could request the treating and nontreating sources to

Although the subsequent tests and examinations resulted in mostly unremarkable findings, as discussed in depth below, it is not this Court's place to speculate in the first place as to how a medical expert might account for these records in calculating Plaintiff's RFC. See Smith, 637 F.2d at 972 (ALJ may not draw speculative inferences from medical reports); Cotter, 642 F.2d at 704. It may be that the nonexamining medical expert would agree with the ALJ that the extent of the limitations assigned by the treating sources is inconsistent with the medical evidence of record and the ALJ will reach the same conclusion as here.[7] Indeed, that was Dr. Bustos' conclusion in his initial review. (See R. 490 ("The severity [and] duration of symptoms are partially [proportionate] to the expected and partially consistent to the [totality] of evidences. The degree of alleged difficulties are not [totally] supported by objective evidences."). The problem is, however, that the medical consultant must be given the opportunity to make that assessment himself upon a complete medical record that includes a medical

_____

submit additional evidence or further clarification of their opinions. (R. 86.) The ALJ did not seek additional evidence or clarification from the nontreating consultants despite receiving additional evidence from the treating sources.

[7] As discussed in depth below, the ALJ's conclusions are supported by substantial evidence.

source statement.[8] Accordingly, the Court will remand this matter
to permit the ALJ to update the medical expert's opinion.

Although the Court is remanding this matter, it finds it
appropriate to address Plaintiff's remaining arguments.
Plaintiff next challenges the ALJ's findings with respect to Dr.
Bromley's opinion. In relevant part, Dr. Bromley opined that
Plaintiff could sit for only 2 hours and stand for only 1 hour,
and would likely require frequent breaks and absences. (See,
e.g., R. 14 (citing Ex. 21F).) As the vocational expert
testified, these limitations would preclude all work. (Id. at
45-56.) The ALJ, however, found Dr. Bromley's opinion to be only
"somewhat credible" because it was inconsistent with the
longitudinal medical record. (Id. at 14.) In particular, Dr.
Bromley opined that Plaintiff's "depression and anxiety are part
of his symptom Complex" and "[t]here is significant psychogenic

---

[8] Kroh, 2014 WL 4384675, at *21; Cadillac, 84 F. App'x at
169; Santos, 2014 WL 5474576, at *16; see also SSR 96-6p ("In
appropriate circumstances, opinions from State agency medical
and psychological consultants and other program physicians and
psychologists may be entitled to greater weight than the
opinions of treating or examining sources. For example, the
opinion of a State agency medical or psychological consultant or
other program physician or psychologist may be entitled to
greater weight than a treating source's medical opinion **if the
State agency medical or phychological consultant's opinion is
based on a review of a complete case record that includes a
medical report from a specialist in the individual's particular
impairment** which provides more detailed and comprehensive
information than what was available to the individual's treating
source." (emphasis added)).

overlay." (Id. at 618, 14.) However, Plaintiff himself characterized his depression as "mild" or "minor", thus undermining Dr. Bromley's conclusion. In addition, the ALJ noted that Dr. Bromley's opinion limited Plaintiff to standing for two hours and sitting for one hour, although his impairments are non-exertional. (Id. at 14.) Although the ALJ concluded that Plaintiff was capable of performing less than the full range of light exertional work, the severity of the limitations assessed by Dr. Bromley are not supported by the objective medical evidence of record or by Plaintiff's description of his daily activities. For example, Plaintiff testified that he spends his time reading, using the computer, and watching his daughter play – all sedentary activities that require a significant amount of sitting. (See id. at 33.)[9] Moreover, while Plaintiff testified to his inability to walk for long distances, there is no medical evidence to support a daily limitation of only 1 hour of standing or walking.

Several other aspects of Dr. Bromley's opinion are also inconsistent with the longitudinal medical record. For instance,

---

[9] See also id. ("[O]f late, I really haven't been able to do a lot of anything except sit on the computer, and even then, looking at a computer monitor just hurts. Sometimes I'll just grab and I'll switch activities every so often, going from a computer to reading a book to reading something to my daughter . . . I'll usually kind of just put my head back and shut my eyes.").

Dr. Bromley opined that Plaintiff showed some limitation in using his arms for reaching and his fingers for fine manipulations, but aside from Plaintiff's fibromyalgia diagnosis, there is no medical evidence supporting these limitations. And, there is certainly no medical evidence to support the conclusion that Plaintiff suffers "significant" limitations in repetitive reaching, handling, fingering, or lifting.[10] (See id. at 620; see also id. at 536-37 (finding full range of motion, with no limitation, upper extremity strength of 5/5, intact sensation, and no tenderness to palpitation), 599 (exhibiting 5/5 motor strength and normal sensory testing, as well as normal ambulation), 631 ("fine finger coordination was normal").) In addition, as the ALJ noted, Dr. Bromley explained that Plaintiff's migraines are generally triptan-responsive. (Id. at 614.)

Plaintiff contends that Dr. Bromley's opinion must be accepted because it is well-supported by Plaintiff's partial response to medication, dizziness associated with ataxia and unsteadiness, and positive tender points, as well as a sleep study showing severe obstructive sleep apnea and an MRI showing

---

[10] The Court also notes that, after generally concluding that Plaintiff has "significant" limitations, he inexplicably classifies all of the limitations in Plaintiff's upper extremities as "minimal." (See R. 620, 617.) These conclusions appear to be inconsistent.

28

a pineal cyst. (See Pl.'s Br. at 16 (citing R. 614).) Notably,
however, even Dr. Bromley agreed that the pineal cyst fails to
explain Plaintiff's subjective symptomology. (See R. 462 (pineal
cyst is "incidental"), 360 ("benign" pineal cyst); see also id.
at 535 (repeat MRI on October 30, 2009 "was unremarkable except
the incidental finding of a pineal cyst").) Furthermore, the
longitudinal medical record is rife with CTs and MRIs that
yielded "unremarkable" findings. (See, e.g., R. 359, 358, 376,
532-537 ("there does not appear to be any link between his spine
and symptoms that he is currently experiencing"), 542-43.) Dr.
Alan Turtz conducted a neurosurgical follow-up visit and
expressed his "doubt [that Plaintiff's] symptoms are related to
any of the findings on his scan."[11] (Id. at 600.) Thus, the Court
cannot conclude that the ALJ erred in finding the treating
physician's opinion only somewhat credible.

Plaintiff next argues that the ALJ erred in rejecting Dr.
Yellin's opinion that Plaintiff was unable to work due to his
migraines and tension headaches (see id. at 14 (citing Ex.
22F)). The ALJ accorded Dr. Yellin's opinion "reduced weight"
because he found that it was based on "full credibility" from
Plaintiff and, here, the ALJ found Plaintiff less than credible.

---

[11] Dr. Turtz noted that Plaintiff's most recent MRI showed a
borderline Chiari malformation but apparently rejected the
radiologist's suggestion that this may cause headaches. (See id.
at 599-600.)

(See id.) In addition to completing a headache questionnaire, Dr. Yellin also submitted a report summarizing his neurological examination of Plaintiff on June 14, 2012. (Id. at 629-31.) Plaintiff argues that the ALJ failed to address Dr. Yellin's examination findings, which included notation of Plaintiff's "markedly unsteady" gait as well as Plaintiff's complaints of pain and tenderness when touched. (See id. at 631.) Setting aside the fact that Dr. Yellin examined Plaintiff on a single occasion, while Dr. Yellin noted Plaintiff's gait, he explained that it was not "clearly characteristic [of] a specific neurologic condition." (Id.) Furthermore, Plaintiff exhibited a normal gait and posture, as well as normal sensory and motor functioning at many other previous appointments. (See, e.g., id. at 465, 360, 525-26, 531-32, 599-600.) As to the latter "finding", this notation merely reflects Plaintiff's subjective complaints of pain that, as noted by the ALJ, depends upon Plaintiff's credibility.

Plaintiff also argues that Dr. Yellin's conclusions are based on his review of Plaintiff's other medical records, and thus are well-supported. Dr. Yellin's evaluation included a review of certain notes and scans relating to Plaintiff's maxillary cyst, Plaintiff's March 30, 2009, October 30, 2009, and March 15, 2010 MRIs, and Dr. Turtz's neurological examination notes. (Id. at 630.) However, in summarizing these

30

records, Dr. Yellin acknowledged the benign findings of the MRIs,[12] as well as Dr. Turtz's "essentially [] normal neurological examination with the exception of lightheadedness on position changes." (Id.) These mostly unremarkable medical records in combination with Dr. Yellin's summary of Plaintiff's complaints and symptoms support the ALJ's conclusion that Dr. Yellin's opinion is largely dependent upon Plaintiff's subjective complaints of pain and symptoms, which the ALJ found to be less than credible.[13] See infra. Finally, to the extent that Plaintiff seeks to rely upon Dr. Yellin's opinion that Plaintiff is "unable to work," this conclusion is on an issue reserved to the Commissioner and thus the ALJ need not afford it any special significance. See 20 C.F.R. § 404.1527(e)(1); SSR 96-5.

Plaintiff also challenges the ALJ's rejection of Dr. Condoluci's opinion that Plaintiff is unable to work because of his "severe vertiginous episodes." (R. 598.) Although the ALJ

---

[12] Specifically, the March 30, 2009 MRI showed a pineal cyst and mild cerebellar tonsillar ectopia without evidence of Chiari malformation; the March 15, 2010 MRI shows a borderline Chiari I malformation but "[o]therwise, unremarkable examination;" and the October 30, 2009 MRI of Plaintiff's lumbar spine that yielded no findings explaining Plaintiff's symptoms.

[13] It should also be noted that Dr. Yellin expressed his belief that Plaintiff's "headache management has not been maximized and he should be on increased doses of medication." (R. 631.)

found that Plaintiff suffers from migraines and vertigo, he rejected Dr. Condoluci's conclusion that the impairments are severe enough to be completely disabling because the ALJ found Dr. Condoluci's opinion was inconsistent with the medical record. (Id. at 14.) For the same reasons set forth above in the context of Drs. Bromley and Yellin, the Court finds that the ALJ's conclusions are supported by substantial evidence in the record. (See, e.g., id. at 465, 360, 525-26, 531-32, 599-600.) In addition, Dr. Condoluci's April 8, 2010 letter sets forth no functional limitations but simply asserts in a conclusory fashion that Plaintiff's vertigo prevents him from working. As explained above, however, a treating physician's opinion that a plaintiff is "unable to work" or is "disabled" is not entitled to any significant weight as it is an issue reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(1); SSR 96-5.[14] Thus,

---

[14] Moreover, while not specifically cited by the ALJ, Dr. Condoluci's opinion is inconsistent with his own examination findings. Plaintiff presented to Dr. Condoluci with vertigo and migraines, but his physical examination was "unremarkable." (Id. at 598.) Plaintiff was given a Medrol Dosepak and Dr. Condoluci ordered several serologies but these came back negative. Plaintiff's blood count was normal, although a C-reactive protein was elevated and he had evidence of a previous infection. (Id.; see also id. at 601-10.) Dr. Condoluci also noted, without comment, Plaintiff's March 15, 2010 MRI findings. Dr. Condoluci then prescribed treatment with prednisone and recommended a neurosurgical evaluation. (Id.) As explained above, Dr. Turtz examined Plaintiff a few weeks later and expressed his doubt that Plaintiff's symptoms were connected to the MRI findings. (Id. at 599-600.)

the Court concludes that the ALJ provided sufficient explanation, when viewed in context, for his rejection of Dr. Condoluci's opinion, and that rejection is supported by substantial evidence.

### b. Evaluation of Plaintiff's Credibility

Plaintiff next claims that the ALJ erred in weighing Plaintiff's credibility and failed to provide sufficient justification for rejecting Plaintiff's subjective complaints of pain. The Court disagrees.

An ALJ must consider the claimant's subjective complaints of pain; however, pain alone cannot be the basis for a finding of disability. 42 U.S.C. § 423(d)(5)(A). Rather, "the subjective complaints of pain must be accompanied by objective medical evidence showing the existence of a condition that reasonably could be expected to produce the alleged symptomalogy and support a finding of disability." Alward v. Comm'r of Soc. Sec., No. 08-3373, 2009 WL 4798263, at *7 (D.N.J. Dec. 8, 2009) (citing Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992)). Moreover, "[i]t is the claimant's burden to prove that [his] subjective complaints of pain are substantiated by medical evidence." Id.

As the fact finder, the ALJ can "reject partially, or even entirely, such subjective complains if they are not fully credible." Weber v. Massanari, 156 F. Supp. 2d 475, 485 (E.D.

33

Pa. 2001) (citation omitted). In doing so, "he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." Fargnoli, 247 F.3d at 43; see also Burnett, 220 F.3d at 122; 20 C.F.R. § 404.1545(a)(1). It is insufficient for an ALJ to make a conclusory statement regarding a Plaintiff's credibility. See SSR 96-7P ("It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' "). The ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p.

SSR 96-7p recognizes that an individual's symptoms may suggest a greater level of severity than can be shown by the objective medical evidence. In those instances, the ALJ must consider the following factors when assessing credibility: the claimant's daily activities, location, duration, frequency, and intensity of pain or symptoms, factors that precipitate and aggravate the symptoms, medication or treatment, other methods of pain relief, and other factors. SSR 96-7p.

Here, the ALJ addressed Plaintiff's testimony during both hearings in which he described having vertigo and migraines every day. (See R. 13-14.) The vertigo causes Plaintiff to stumble and fall at least once a day. (Id.) Plaintiff explained that he had tried two different medications for his vertigo, but had discontinued use after experiencing adverse reactions. (Id.) As for his migraines, Plaintiff takes injectable Lyrica, among other medications, which effectively subsides the most severe migraine within five minutes but he tries to take it only a few times per month. Plaintiff also uses a CPAP machine nightly, which permits him to sleep well. (Id.)

After setting forth this summary of Plaintiff's testimony, the ALJ concluded that "the claimant's subjective complaints are not fully credible, considering the claimant's own description of his activities and life style, the degree of medical treatment required, discrepancies between the claimant's assertions and information contained in the documentary reports, the reports of the treating and examining practitioners, the claimant's demeanor during the hearing, the medical history, the findings made on examination, and the claimant's assertions concerning his ability to work." (Id. at 13.) Plaintiff contends that this explanation fails to provide specifics and thus, is "so vague as to frustrate judicial review." (Pl.'s Br. at 22.) Although Plaintiff argues that the ALJ could certainly have

35

provided a more fulsome discussion – which may always be the case - the Court finds that he has provided sufficient reasons for discounting Plaintiff's testimony, when viewed in the context of the ALJ's explanation of Plaintiff's daily activities and medical record, so as to permit adequate judicial review.

Moreover, the Court finds the ALJ's conclusion is supported by substantial evidence. Plaintiff explained that he does not work because "the migraines and the vertigo just stop me during the middle of the day." (R. 56.) Plaintiff testified that he is taking medication[15] that "take[s] the edge off" of his headaches and sometimes helps him more than other times. (Id. at 57.) In addition, the Lyrica he takes for his fibromyalgia stops his most severe headaches within minutes. (Id. at 13.) He also believed his Lyrica dosage could be increased to reduce the pain in his extremities. (Id. at 38.) Dr. Yellin also expressed his belief that Plaintiff's "headache management has not been maximized and he should be on increased doses of medication." (Id. at 631.) To the extent light and sound exacerbates or precipitates Plaintiff's migraines, he has employed certain measures to avoid these factors, such as wearing earplugs and

---

[15] Plaintiff testified to Dr. Bromley's prescribed course of treatment depending on the magnitude of Plaintiff's headache: first, over the counter pain relievers, then Fioricet, and then either a pill or injectable form of Imitrex. (Id. at 28.)

refraining from driving at night. Notably, the RFC assessed by
the ALJ calls for avoiding noise and vibration.

As the ALJ acknowledged, Plaintiff described his daily
activities as reading the Bible or reading to his daughter,
playing puzzles with or home-schooling his daughter, and using
the computer. (Id. at 33, 58.) He is also able to care for his
own personal needs, cook dinner or prepared meals, lift and
carry books, or lift his 42-pound daughter. (Id. at 34-35.) He
is also involved in church activities three times a week. (Id.
at 37.) Plaintiff shops on a limited basis and, though he
testified that he only drives to the grocery store, he also
drove himself to the hearing before the ALJ. (Id. at 31-32.)
Plaintiff also told Dr. Waters that he is able to shop, perform
household chores on a limited basis, shower, groom, and feed
himself on an independent basis. (Id. at 464.) The extent of his
activities does not support Plaintiff's assertion this his
impairments are so severe that they are disabling.

The vertigo is "near-constant" but varies in severity from
the room spinning a "tiny bit" to, at times, stumbling and
falling. (Id. at 30.) However, he only stumbles about once a day
and the record is replete with examination findings of full and
intact motor and sensory functions, as well as full ambulation
with a normal gait. (See, e.g., R. 360, 465, 525-26 ("steady
gait", no cerebellar, sensory, or motor deficits), 531-32, 599-

37

600.) Moreover, while Dr. Yellin reported that Plaintiff's gait was "unsteady" on the day he was examined, he remarked that the pattern was "not clearly characteristic [of] a specific neurologic condition." (Id. at 631.)

As the ALJ noted, there are also other inconsistencies between Plaintiff's testimony and the other evidence of record. For example, Plaintiff testified that his migraines last "at least an hour, if not longer." However, he informed Dr. Yellin that his headaches last for only "minutes." (R. 624.) Indeed, during an October 30, 2009 examination, Dr. Caroline Robiak documented Plaintiff's history of migraines since February 2009 and noted that Plaintiff "had one of these migraine attacks during my exam, and it lasted for approximately 1 minute." (Id. at 531.) Thus, the Court finds that the ALJ's credibility assessment is supported by substantial evidence.

## V.   Conclusion

For the reasons set forth above, the Court will VACATE the decision of the ALJ and REMAND for further proceedings consistent with this Opinion.


Date: December 16, 2014

                              s/Renée Marie Bumb
                              RENÉE MARIE BUMB
                              UNITED STATES DISTRICT JUDGE